UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-61329-CIV-MARRA/JOHNSON

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) |
| CHRISTI R. SULZBACH | ) ) |
| Defendant. | |

**ORDER AND OPINION**

THIS CAUSE is before the Court on Defendant Christi Sulzbach's ("Defendant" or "Sulzbach") Motion for Summary Judgment (DE 87, 88). Plaintiff United States of America ("Plaintiff," "United States," "the government") filed a Response to the Motion (DE 101) and Defendant filed a Reply (DE 115). The motion is fully briefed and ripe for review. The Court has reviewed the motion, response, reply, the entire file in this case, and is otherwise duly advised in the premises.

**Background**

In 1994, Defendant was Associate General Counsel of National Medical Enterprises, Inc. (NME), a large hospital chain, which later merged with another company, American Medical Holdings, Inc. (AMH), and was renamed Tenet Healthcare Corporation (Tenet). In 1994, NME and the government settled fraud charges that the government had brought against it. As part of the settlement, NME agreed to implement a Corporate Integrity Program, memorialized by a Corporate Integrity Agreement, to ensure that future misconduct did not occur. Sulzbach was

1

placed in the position of Corporate Integrity Program Director for NME and then Tenet. In that position, Sulzbach signed sworn declarations on a yearly basis, assuring the Department of Health and Human Services (HHS) that NME/Tenet was in material compliance with the legal requirements for the federal health care program.

In this case, the government has alleged that the Defendant violated the False Claims Act, 31 U.S.C. § 3730, when she submitted sworn declarations in June 1997 and June 1998 that falsely certified that Tenet was in compliance with applicable federal program requirements. Specifically, the government alleges that Sulzbach's certifications were false for failing to disclose that Tenet was violating the Stark Statute, 42 U.S.C. § 1395nn, by billing Medicare for referrals from twelve physicians who practiced at a Tenet facility in Ft. Lauderdale known as North Ridge Medical Center (North Ridge), and by allowing those violations to continue.

The parties filed cross-motions for summary judgment. In Sulzbach's motion, she argues, in part, that the government's False Claims Act case against her is barred by the applicable statute of limitations. For the reasons explained below, the Court agrees.

**Material Facts**

The facts, as culled from affidavits, exhibits, depositions, answers, answers to interrogatories and reasonably inferred therefrom in a light most favorable to Plaintiff, for the purpose of this motion, are as follows:

1. In 1994, Defendant Christi Sulzbach ("Sulzbach") was employed as Associate General Counsel at National Medical Enterprises, Inc. ("NME"). (Sulzbach Dep. 15:8-16:2, June 3-4, 2009, Def. Appendix ("App."), Exhibit ("Ex.") 1.)

2. In June 1994, NME resolved a civil and criminal dispute with the United States concerning a subsidiary entity, Psychiatric Institutes of America ("PIA") and various psychiatric facilities

operated by PIA.  (Id. 18:20-18:25, 21:8-22:9.)  As part of the settlement, on June 29, 1994, NME and the Department of Health and Human Services ("HHS") entered into either the very first or one of the first healthcare corporate integrity agreements ("CIA").  (NME Corporate Integrity Agreement (June 29, 1994) ("CIA"), Def. App., Ex. 2; Sulzbach Dep. 18:20-20:2, 163:25-164:4; Morris Dep. 30:18-31:22, September 9, 2009, App., Ex. 3; OIG, "Protecting Public Health and Human Services Programs: A 30-Year Retrospective" (2006), at 38-39 ("OIG 30 Year Retrospective"), Def. App., Ex. 4.)

3.  Sulzbach was named NME's first Corporate Integrity Program Director and became responsible for overseeing NME's compliance program.  (Sulzbach Dep. 15:24-17:23, 152:19-152:24.)

4.  Pursuant to the CIA, NME was required to submit annual compliance reports to HHS from June 1995 to June 1999 detailing the company's compliance efforts.  (CIA at ¶ 10.)  Sulzbach was responsible for supervising the preparation of these reports and was required to certify under oath that to the best of her knowledge and belief the company was in compliance with the terms of the CIA and federal program legal requirements.  (Id.; Sulzbach Dep. 146:18-147:21.)

5.  In early 1995, NME acquired American Medical Holdings, Inc. ("AMI"), and then changed its name to Tenet Healthcare Corp. ("Tenet").  (Schochet Barbera Dep[1]. 17:21-18:16, September 24, 2003, Def. App., Ex. 11.)

6.  In 1993 and 1994, one of AMI's hospitals, North Ridge Medical Center ("North Ridge"), entered into a number of physician employment agreements with primary care physicians.  The physicians employed by North Ridge later became known as "Lauderdale Clinical Services" or

---

[1] Deposition testimony cited in this Order as "Deponent Barbera Dep." refers to the deponent's deposition during the course of the Barbera litigation.

"LCS."  (Steigman Barbera Dep. 315:2-315:14, January 16-18, 2003, Def. App., Ex. 12.)
Sulzbach was not employed by AMI when the LCS agreements were entered into and thus had no role in their negotiation or approval.  (Sulzbach Dep. 178:12-178:17.)  As a result of the AMI acquisition, North Ridge became one of the many acute care hospitals owned by Tenet, and Tenet inherited the LCS agreements.  (Id.; Schochet Barbera Dep. 17:21-18:20.)

7.  In 1995, during the AMI acquisition, and in 1996 as part of normal compliance reviews, Tenet employed McDermott, Will & Emery ("McDermott") to review the North Ridge physician agreements.  (Goldman Dep. 140:4-149:12, May 6, 2009, Def. App., Ex. 13.)

8.  In early 1996, Tenet hired Sal Barbera to head the Florida office of Tenet Physician Services ("TPS"), the Tenet organization responsible for managing its physician practices.  (Brown Barbera Dep. 19:10-19:21, September 22, 2003, Def. App., Ex. 14.)  Approximately six months later, Barbera was terminated.  Following a dispute over his severance, Barbera filed a wrongful termination suit in January 1997, alleging in part that he was fired for attempting to raise the issue that certain physician agreements were illegal.  (Id. 34:21-41:9; Sulzbach Dep. 44:10-47:5; Barbera Barbera Dep. 150:8-171:10, Dec. 10, 2001, Def. App., Ex. 15.)

9.  In a December 2001 deposition attended by the United States, Barbera gave testimony concerning his allegations in the wrongful termination suit that the LCS contracts were illegal.  (Barbera Barbera Dep. 150:8-171:10, Dec. 10, 2001.)

10.  Tony Bennett was the chief financial officer of TPS-Florida in early 1997.  Shortly after Jeff Heinemann took charge of TPS in early 1997, Bennett orally expressed to Heinemann his concerns regarding the legality of certain of the Florida physician contracts.  At Heinemann's request, Bennett memorialized his concerns in a memorandum dated February 24, 1997, and entitled "Legal Concerns related to LCS practices" (the "Bennett Memo").  (Bennett Barbera

4

Dep. 200:15-201:16, May 9-10, 2000, Def. App., Ex. 18.)  Heinemann then forwarded the Bennett Memo to Sulzbach.  (Heinemann <u>Barbera</u> Dep. 154:10-155:2, March 13, 2003, Def. App., Ex. 19.)

11.  In late March 1997, Sulzbach met with Bennett to further discuss his concerns.  Tom Holliday of Gibson, Dunn & Crutcher LLP also attended, and Don Goldman of McDermott, Will & Emery ("McDermott") participated by phone. (Bennett Dep. 46:20-51:12, September 4, 2009, App., Ex. 20; Bennett <u>Barbera</u> Dep. 268:5-270:13; Sulzbach Dep. 37:9-43:15; Holliday Dep. 26:25-28:4.)

12.  Goldman, Tenet's regular outside counsel for healthcare regulatory advice, was tasked with looking further into the issues raised by Bennett, as well as the similar issues that had been raised in Barbera's wrongful termination suit.  (Sulzbach Dep. 37:3-43:15.)

13.  In April 1997, Goldman tapped Myla Reizen, a second-year associate in McDermott's Miami office, to review and analyze the Florida physician contract files, including the LCS agreements.  (Goldman Dep. 53:22-54:3.)

14.  Based upon a review of the contract files, in May 1997, Reizen prepared a report analyzing potential Stark concerns regarding the LCS and other Florida physician agreements (the "McDermott Report").  (Reizen Dep. 60:22-61:14, July 21-22, 2009, Def. App., Ex. 21; Goldman Dep. 149:19-154:23.)[2]  Reizen's report was slightly revised in June of 1997. (Goldman Dep. 116:8-116:17.)

---

[2] The Court notes that Defendant characterizes the May 27, 1997 McDermott Report as a non-finalized "draft," contends that McDermott did not issue its report to Tenet in 1997, and asserts that Reizen never discussed the Stark concerns with anyone at Tenet.  However, for purposes of ruling on Defendant's motion for summary judgment, all disputes of fact are viewed in the light most favorable to Plaintiff, the United States. <u>See</u> DE 102 at ¶¶ 24-30.

15. Also in May 1997, Barbera filed under seal a second lawsuit, this one a *qui tam* action under the False Claims Act against North Ridge and Tenet, alleging, in part, that the LCS contracts violated Stark ("the Barbera litigation"). (Relators' *Qui Tam* Complaint, filed May 13, 1997 in U.S. ex rel. Barbera v. Tenet Healthcare Corp., Case No. 97-6590, Def. App., Ex. 22.)  When the case was filed, Barbera's counsel sent copies of the *qui tam* complaint, along with other information concerning his allegations, to the United States Department of Justice and the United States Attorney for the Southern District of Florida.  (Letter from Gary Sherman to William Keefer and Janet Reno (May 13, 1997), Def. App., Ex. 23.)

16. In the Spring of 1997, Tenet was aware of concerns that the North Ridge LCS contracts it had inherited from AMI might be in violation of the Stark Law.  (Sulzbach Dep. 36:11-38:13.) Defendant made a determination to not disclose the LCS issues to the government. (Id. 173:4-177:22, 183:7-184:6.)[3]

17. In June 1997 and again in June 1998, Tenet submitted Annual Compliance Reports to HHS. (Tenet Healthcare Corp., Annual Compliance Report (June 27, 1997), Def. App., Ex. 32; Tenet Healthcare Corp., Annual Compliance Report (June 26, 1998), Def. App., Ex. 33.).  Both the June 1997 and June 1998 submissions contained Sulzbach's sworn certifications that "to the best of [her] knowledge and belief, Tenet is in material compliance with the terms of the Corporate Integrity Agreement, as well as . . . other federal program legal requirements," notwithstanding the lack of disclosure of the LCS concerns.  (Sulzbach Dep. 173:4-177:22, 183:7-184:6; Tenet

---

[3] Defendant contends that she decided not to report the LCS to the government because she concluded she was not obligated to disclose those issues under the CIA. See DE 89 at ¶ 38. The government disputes this assertion, arguing that "[t]here is no evidence in the record that she had any factual or legal basis to support such a belief at that time, that anyone had expressed such a belief to her, or that she had expressed such a belief to anyone else." See DE 102 ¶ at 38. For purposes of this motion, the Court will resolve this dispute in favor of the United States.

1997 Annual Compliance Report (June 27, 1997), at 12; Tenet 1998 Annual Compliance Report (June 26, 1998), at 14.)

18. In April 1998, HHS served a subpoena on Tenet seeking documents relevant to its investigation of Barbera's *qui tam* allegations. (Subpoena from HHS to Tenet Healthcare Corp. (April 27, 1998), Def. App., Ex. 34.).  HHS was thus aware no later than April 1998 of (1) the LCS allegations, (2) Tenet's failure to disclose the LCS issues and (3) that Sulzbach's June 1997 certification of compliance was made despite Tenet's failure to disclose the issues.[4]

19. In May 2000, as part of its investigation into Barbera's *qui tam* claims, the government took Bennett's deposition and learned that in 1997, and prior to Sulzbach's 1997 certification, she had received the Bennett Memo, had met with Bennett to discuss his concerns, and had assured him she would look into them. (Bennett Barbera Dep. 268:5-270:13.)

20. On June 22, 2001, after four years of investigation, the government intervened in the Barbera action and adopted most of Barbera's claims with respect to the LCS physician agreements. (United States' Intervention Complaint, filed June 22, 2001 in U.S. ex rel. Barbera v. Tenet Healthcare Corp., Case No. 97-6590 ("United States' Barbera Intervention Complaint"), Def. App., Ex. 35.)

21. From the very outset of the Barbera case, the government emphasized Bennett's analysis and his efforts to alert others at Tenet about the issues, particularly Sulzbach:

> In this memorandum, Bennett quoted from the Stark II statute, using bold face print on the language dealing with fair market value and relationship of compensation to referrals.  Bennett stated that, in his view, the arrangements were not commercially reasonable.

---

[4] The government acknowledges that it was aware of these issues in April 1998; however, it asserts that it had no evidence of Defendant's personal culpability at that time. See DE 102 ¶ 45.

Shortly after sending his memo, Bennett also presented his concerns in a meeting with Tenet counsel [i.e. Sulzbach].

(United States' Intervention Complaint at ¶ 120, Def. App., Ex. 35).

22. The government further alleged in the Barbera case that, notwithstanding the receipt of this information from Bennett, Tenet failed to prevent North Ridge from submitting illegal claims and failed to notify the government of these issues in its annual compliance reports prepared under Sulzbach's supervision:

> Despite all of these warnings, Tenet continued to allow its subsidiaries to engage in unlawful financial relationships with North Ridge Medical Center physicians, it allowed North Ridge Medical Center to continue billing Medicare for referrals generated by these physicians, . . . and it has failed to mention the issue in any of the annual Compliance Reports that it submitted to the Department of Health and Human Services.

(United States' Intervention Complaint at ¶ 121, Def. App., Ex. 35).

23. Later in the Barbera litigation, on August 18, 2003, the government sought to compel the production of various privileged documents, including the McDermott Report. It its reply brief in support of its motion to compel, the government pointed directly at Sulzbach's meeting with Bennett as proof that Tenet, through Sulzbach, knowingly violated the Stark Law:

> [T]he Government has identified a great deal of evidence that Tenet knew that it was violating the Stark Statute and that its attorneys were directly and personally involved in this unlawful conduct. . . . For example, . . . a February 1997 memorandum by Tenet executive Tony Bennett to his supervisor . . . explained accurately and in detail why the contracts at issue violated Stark Statute. Mr. Bennett has testified that he met with two senior Tenet attorneys for several hours to discuss his memo, and that he was led to believe that they would address his concerns. . . . Mr. Bennett's supervisor also testified that he referred Mr. Bennett's memo to a senior Tenet attorney and relied on her to address them. . . . Mr. Bennett's memo warning that the contracts at issue violated the Stark Statute was clear, specific, and legally and factually correct. The fact that Tenet subsequently terminated or renegotiated all of these contracts indicates Tenet counsel recognized Mr. Bennett's concerns were valid. . . .

(United States' Reply Brief in Support of Revised Motion to Compel, filed August 18, 2003 in U.S. ex rel. Barbera v. Tenet Healthcare Corp., Case No. 97-6590, at 5-6 ("United States' Barbera Compel Reply"), Def. App., Ex. 41.)

24. Additionally, in the government's August 18, 2003 reply brief in the Barbera litigation, the government argued the crime-fraud exception to overcome Tenet's assertions of attorney-client privilege. Specifically, the government applied the crime-fraud exception to Sulzbach's failure to disclose to the government the issues raised by Bennett:

> [W]hen Tony Bennett began voicing concerns that the contracts were illegal, senior Tenet lawyers met with him, assured him that they would address his concerns, and then allowed the company to continue billing the Government unlawfully without making any disclosure to the Government. This is exactly the type of conduct that the crime-fraud exception was designed to expose.

(United States' Barbera Compel Reply at 6, Def. App., Ex. 41.)

25. In its Barbera December 8, 2003 Pre-Trial Brief, the government relied on Sulzbach's personal knowledge to support its claim that Tenet had knowingly violated the False Claims Act:

> Later documents indicate that the defendants had *actual knowledge* that their relationships with the Doctors violated the Stark Law. . . . In his memo, CFO Bennett explained not only what the Stark Law prohibited and required, but how he believed the actions taken by North Ridge may have violated the statute. The evidence will show that shortly after sending this memo to Mr. Heinemann, CFO Bennett was requested to, and did, discuss his concerns with Christi Sulzbach, Tenet's then Associate General Counsel and Corporate Integrity Program Director. Nevertheless, even after the meeting, Tenet continued to bill Medicare for millions of dollars in claims in violation of the Stark Law and repeatedly certified to the health Care Financing Administration (HCFA) that the company was in compliance with all laws and regulations.

United States' Pre-Trial Brief, filed December 8, 2003 in U.S. ex rel. Barbera v. Tenet Healthcare Corp., Case No. 97-6590, at 26 ("United States' Barbera Pre-Trial Brief"), Def. App., Ex. 42.) (emphasis in original).

9

26. In its December 8, 2003 <u>Barbera</u> Pre-Trial Brief, the government specifically accused Sulzbach of making false certifications under the CIA:

> These false certifications include sworn statements filed by Tenet Healthcare Corporation's Corporate Integrity Program Director and Assistant General Counsel.  Tenet Healthcare Corporation is legally bound by the actions of these employees.

(United States' <u>Barbera</u> Pre-Trial Brief at 35, Def. App., Ex. 42.)

27. In a September 9, 2009 deposition, Lew Morris, the OIG Chief Counsel was asked whether his view that Sulzbach had lied to the Government would be changed if the Court found that Sulzbach had not been advised by outside counsel that the contracts were illegal. Morris testified, in pertinent part: "And I believe that she had **ample evidence** that false claims were continuing to be submitted to our program based on information she was provided by employees **independent of the law firm's report**, assuming for the moment she didn't know about it." (Morris Dep. 41:20-42:3, Def. App., Ex. 3.) (emphasis added).

**Standard of Review**

Summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial responsibility of showing the Court, by reference to the record, that there are no genuine issues of material fact that should be decided at trial.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  When the non-moving party bears the burden of proof on an issue, the moving party may discharge its burden by showing that the materials on file demonstrate that the party bearing the burden of

proof at trial will not be able to meet its burden.  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

When a moving party has discharged its burden, the nonmoving party must "go beyond the pleadings," and, by its own affidavits or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing there is a genuine issue for trial.  Celotex, 477 U.S. at 324.  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  When deciding whether summary judgment is appropriate, the Court must view the evidence and all reasonable factual inferences therefrom in the light most favorable to the party opposing the motion.  Witter v. Delta Air Lines, Inc., 138 F.3d 1366, 1369 (citations and quotations omitted).

This Court may not decide a genuine factual dispute at the summary judgment stage. Fernandez v. Bankers Nat'l Life Ins. Co., 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung, 695 F.2d 1294, 1296 (11th Cir. 1983).  A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hoffman v. Allied Corp., 912 F.2d 1379 (11th Cir. 1990).  However, there must exist a conflict in substantial evidence to pose a jury question. Verbraeken v. Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir.1989).

**Discussion**

Defendant argues that the government's case against her under the False Claims Act, 31 U.S.C. § 3730, is barred by the applicable statute of limitations. The False Claims Act contains its own statute of limitations, which provides as follows:

> (b) A civil action under section 3730 may not be brought--
>
> (1) more than 6 years after the date on which the violation of section 3729 is committed, or
>
> (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,
>
> whichever occurs last.

31 U.S.C. § 3731(b). The Defendant bears the burdens of production and persuasion as to a statute of limitations defense. Smith v. Duff and Phelps, Inc., 5 F.3d 488, 492, n. 9 (11th Cir. 1993).

In this case, the government specifically stated in a March 22, 2010 telephonic hearing with the Court that there are no triable issues of fact on the statute of limitations issue:

> From the Government's perspective, there are no triable issues of fact regarding the statute of limitations issues. The relevant facts are not in dispute. You have them before you on the Defendant's statute of limitations motion. . . .
> And so we don't think that this is something to go to trial on, this is something that you can rule one way or the other on based on the papers.

According to the Complaint, the last date of Sulzbach's alleged violation of the False Claims Act occurred in August of 1999. As such, this case (effectively deemed filed in December 2006 per tolling agreements between the parties) was filed beyond the six-year limitations bar of § 3731(b)(1). Therefore, the government relies on the statutory tolling provision of 31 U.S.C. § 3731(b)(2), and thus was required to file this case within three years of

"the date when facts material to the right of action are known or reasonably should have been known." Id.  In this action, per the "Agreement between the United States and Christi Sulzbach to Toll Statute of Limitations," signed December 14, 2006, the relevant date for determining whether the statute of limitations has expired pursuant to 31 U.S.C. § 3731(b)(2) is December 14, 2003.  See Def. App., Ex. 44.

"[T]he rationale behind tolling requires that the statute of limitations start to run when the plaintiff acquires knowledge of the wrongful activity." U.S. ex rel. Hyatt v. Northrop Corp., 91 F.3d 1211, 1217 (9th Cir. 1996).  As a general rule, statutes of limitations are construed narrowly against the government. BP America Production Co. v. Burton, 549 U.S. 84, 95-96 (2006), citing E.I. Du Pont De Nemours & Co. v. Davis, 264 U.S. 456 (1924).  See also Badaracco v. C.I.R., 464 U.S. 386, 391 (1984).

"[T]he clock does not begin to run on the pertinent statutory limitation merely because the plaintiff had mere suspicions or could conceivably have alleged fraud on the part of the defendant." U.S. v. United Technologies Corp., 255 F.Supp.2d 779, 784 (S.D. Ohio 2003).  Rather, the statutory bar is dropped once the facts making up the essence of the right of action are reasonably knowable. U.S. v. Kass, 740 F.2d 1493 (11th Cir. 1984) (holding government's contract action was barred by the statute of limitations because the suit was not filed for almost eight years after the government had the facts making up the very essence of the right of action.) As the Eleventh Circuit explained in Kass,

> Congress could not, however, be completely forgiving of government delay and still be true to its motives in enacting a statute of limitations. Therefore, it is not necessary that relevant officials have all details of a claim before the statutory period begins to run; once the facts making up the "very essence of the right of

13

action" are reasonably knowable, the § 2416[5] bar is dropped. Cong. News at 2508.

740 F.2d at 1497.

Where scienter is an element of a cause of action, the statute of limitations begins to run not when the plaintiff merely knew or should have known the statement was untrue, but rather when the plaintiff also knew or should have known that the representation was knowingly false:

> In other words, the plaintiff gets a year after he learned or should have learned the facts that he must know to know that he has a claim. In the case of a suit complaining of a false registration statement, all he has to know is that the statement was untrue; so, as soon as he knows or should know that, the one-year period begins to run. In a fraud case, he needs to know more: that the defendant has made a representation that was knowingly false. When the plaintiff knows or should know this, the statute of limitations begins to run.

Law v. Medco Research, Inc., 113 F.3d 781, 785-86 (7th Cir. 1997).  See also Anderson v. Transglobe Energy Corp., 35 F.Supp.2d 1363, 1370 (M.D. Fla. 1999) (statute of limitations begins to run on a Rule 10b-5 securities fraud claim when the plaintiff has either knowledge of the violation or notice of the facts which, in the exercise of due diligence, would have led to actual knowledge thereof).  In U.S. ex rel. Wilkins v. North American Const. Corp., 2001 WL 34109383 (S.D. Tex. 2001), the court granted summary judgment to defendant on the government's common law fraud claim (which also requires the government to prove defendant's knowledge of the falsity of its statements) based on the statute of limitations.  The

---

[5] The language of the statute of limitations for government actions set forth in 28 U.S.C.A. § 2416(c) is nearly identical to the applicable statute of limitations in this case, 31 U.S.C. § 3731(b). Section 2416(c) states:
> For the purpose of computing the limitations periods established in § 2415, there shall be excluded all periods during which ... facts material to the right of action are not known and reasonably could not have been known by an official of the United States charged with the responsibility to act in the circumstances ....

court held that the statute of limitations began running after the government first received the defendant's audit report, since the government was aware at that time that defendant had made false statements with knowledge of their falsity. Id. at 11.  The court rejected the government's argument that later discovery of additional facts could justify its delay in filing suit, once essential facts are known:

> Those additional facts strengthen and add specificity to the government's knowledge of the fraudulent statement . . . . However, the law does not require that the government have information that is so complete or so inculpatory before the responsible official can be charged with knowledge of the facts material to a fraud cause of action, so as to trigger limitations.

Id. at 10.

Here, the government argues that it did not possess meaningful information about Defendant's scienter until 2006, when it received a copy of the 1997 McDermott Report concerning the LCS issues.  The government claims that, prior to 2006, it only had evidence that Tenet had knowingly made false statements based on the "collective" knowledge and conduct of its officers and employees. (Resp. 11).  See, e.g., U.S. v. Bank of New England, N.A., 821 F.2d 844, 856 (1st Cir. 1987) ("[T]he knowledge obtained by corporate employees acting within the scope of their employment is imputed to the corporation.").  According to the government, until it obtained the McDermott Report from Tenet in 2006, the government lacked essential evidence of Sulzbach's scienter, i.e., that Sulzbach had *knowingly* submitted false certifications.  Thus, the government claims that, although the case was filed a decade after the events at issue, it is not barred by the statute of limitations.

The Court disagrees.  First, based on the undisputed facts regarding the evidence of Defendant's scienter that the government did have prior to 2003, the government knew or should

15

have known of the facts material to its cause of action.[6] Moreover, in the government's attempt to prove that Tenet had knowing violated the False Claims Act in the prior case, the government made multiple statements to the Court that Sulzbach knowingly made false certifications and that Tenet was bound by Sulzbach's knowledge.

The government has known since Barbera filed his *qui tam* complaint in May 1997 that there were potential LCS Stark Law issues, and thus cannot dispute that it knew about those issues when Sulzbach submitted her annual compliance report certifications in June 1997 and June 1998. The government has also known since, at the latest, May 2000, that Sulzbach knew about the LCS Stark Law issues when she made her certifications. For it was in May 2000 that the government took the deposition of Tony Bennett, who testified that Sulzbach both received his February 1997 memo and then met with him a few weeks later to discuss his concerns. Thus, based on what it learned in the Bennett deposition and in other discovery, no later than May 2000, the government was aware that (1) Bennett had presented his concerns regarding the LCS contracts to Sulzbach, Tenet's Compliance Program Director in both memo form and in person, (2) the concerns expressed by Bennett were also set forth in the complaint filed in the Barbera *qui tam* lawsuit in May 1997, (3) Sulzbach had not notified HHS of the potential violations raised by Bennett, and (4) notwithstanding the lack of notice to HHS, in both June 1997 and June 1998, Sulzbach had certified Tenet's material compliance with its obligations under the CIA and applicable federal law.

---

[6] Defendant does not contend a lack of diligence by the government in discovering its causes of action. Rather, she contends that the government had knowledge of the facts material to the causes of action many years prior to the filing of this case.

Moreover, in the government's attempt to prove that Tenet had knowingly violated the False Claims Act in the prior case, the government made multiple statements to the Court that Sulzbach was personally involved in the unlawful conduct, that she knowingly made false certifications, and that Tenet was bound by Sulzbach's knowledge.[7]  From the very outset of the Barbera case, the government emphasized Bennett's efforts to alert others at Tenet about the issues, particularly Sulzbach:

> In this memorandum, Bennett quoted from the Stark II statute, using bold face print on the language dealing with fair market value and relationship of compensation to referrals.  Bennett stated that, in his view, the arrangements were not commercially reasonable.  Shortly after sending his memo, Bennett also presented his concerns in a meeting with Tenet counsel [i.e. Sulzbach].

(United States' Intervention Complaint at ¶ 120).  The government further alleged in the Barbera case that, notwithstanding the receipt of this information from Bennett, Tenet failed to prevent North Ridge from submitting illegal claims and failed to notify the Government of these issues in its annual compliance reports prepared under Sulzbach's supervision:

> Despite all of these warnings, Tenet continued to allow its subsidiaries to engage in unlawful financial relationships with North Ridge Medical Center physicians, it allowed North Ridge Medical Center to continue billing Medicare for referrals generated by these physicians, . . . and it has failed to mention the issue in any of the annual Compliance Reports that it submitted to the Department of Health and Human Services.

(United States' Intervention Complaint at ¶ 121).

---

[7] In an interesting twist, the government argues that Defendant's counsel has changed its position as to the legal significance of the government's evidence between the Barbera litigation and this case. (Resp. at 15-16).  Unlike the assertions the government made against Tenet regarding Sulzbach in the Barbera litigation, where its counsel was acting on behalf of the same client, the prior assertions to which the government now points were made by attorneys representing Tenet, a different client.  The statements made by counsel in an another case on behalf of a different client cannot be attributable to or held against Sulzbach.

Later in the Barbera litigation, on August 18, 2003, the government pointed directly at Sulzbach's meeting with Bennett as proof that Tenet, through Sulzbach, knowingly violated the Stark Law:

> [T]he Government has identified a great deal of evidence that Tenet knew that it was violating the Stark Statute and that its attorneys were **directly and personally involved in this unlawful conduct**. . . .  For example, . . . a February 1997 memorandum by Tenet executive Tony Bennett to his supervisor . . . explained accurately and in detail why the contracts at issue violated Stark Statute.  Mr. Bennett has testified that he met with two senior Tenet attorneys for several hours to discuss his memo, and that he was led to believe that they would address his concerns. . . .  Mr. Bennett's supervisor also testified that he referred Mr. Bennett's memo to a senior Tenet attorney and relied on her to address them. . . . Mr. Bennett's memo warning that the contracts at issue violated the Stark Statute was clear, specific, and legally and factually correct.  The fact that Tenet subsequently terminated or renegotiated all of these contracts indicates Tenet counsel recognized Mr. Bennett's concerns were valid. . . .

(United States' Barbera Compel Reply at 5-6) (emphasis added).  Specifically, the government applied the crime-fraud exception to Sulzbach's failure to disclose to the government the issues raised by Bennett:

> [W]hen Tony Bennett began voicing concerns that the contracts were illegal, senior Tenet lawyers met with him, assured him that they would address his concerns, and then allowed the company to continue billing the Government unlawfully without making any disclosure to the Government.  This is exactly the type of conduct that the crime-fraud exception was designed to expose.

(United States' Barbera Compel Reply at 6).

Finally, in its Barbera Pre-Trial Brief, the government relied on Sulzbach's personal knowledge to support its claim that Tenet had knowingly violated the False Claims Act:

> Later documents indicate that the defendants had *actual knowledge* that their relationships with the Doctors violated the Stark Law. . . .  In his memo, CFO Bennett explained not only what the Stark Law prohibited and required, but how he believed the actions taken by North Ridge may have violated the statute.  The evidence will show that shortly after sending this memo to Mr. Heinemann, CFO Bennett was requested to, and did, discuss his concerns with **Christi Sulzbach**, Tenet's then Associate General Counsel and Corporate Integrity

> Program Director. Nevertheless, even after the meeting, Tenet continued to bill Medicare for millions of dollars in claims in violation of the Stark Law and repeatedly certified to the health Care Financing Administration (HCFA) that the company was in compliance with all laws and regulations.

(United States' Barbera Pre-Trial Brief at 26). In the Barbera litigation, the government also specifically accused Sulzbach of making false certifications under the CIA, and stated that Tenet was legally bound by her actions:

> These false certifications include sworn statements filed by Tenet Healthcare Corporation's Corporate Integrity Program Director and Assistant General Counsel. Tenet Healthcare Corporation is legally bound by the actions of these employees.

(United States' Barbera Pre-Trial Brief at 35). The government cannot on the one hand attempt to impute Sulzbach's intentional fraudulent conduct to Tenent in order to hold Tenent liable, or to prove a waiver of the attorney-client privilege based upon a crime-fraud exception, and on the other hand now claim that they were unaware of Sulzbach's fraudulent intent. These statements made by the government in the Barbera case make it clear that years prior to receiving the McDermott report in 2006, the government had formed the belief that Sulzbach had knowingly made false certifications and pointedly and repeatedly made those statements to the court.[8]

As OIG Chief Counsel Lew Morris stated in his deposition, independent of the McDermott report, Sulzbach had "ample evidence" that false claims were continuing to be submitted; the government, in turn, knew of this "ample evidence" years before it received a copy of the McDermott report. The government's argument that it did not know "what subsequent steps, if any, the Defendant took following the meeting [with Bennett]," see Resp. at

---

[8] Notably, the government's opposition brief does not attempt to argue that Defendant's motion misquotes or takes out of context the statements the government made against Sulzbach in the Barbera litigation.

14, is insufficient to save the government's claims, in light of the evidence available to it at the time of the Barbera case. The limitations clock does not re-start every time a plaintiff learns of a new fact or "better evidence" that supports its claim.

Based upon the foregoing, the Court concludes that the government (1) had sufficient evidence of Defendant's scienter prior to December 14,2003, such that it knew or should have known of the facts material to its cause of action, and (2) pointedly and repeatedly represented in the Barbera litigation that Sulzbach had knowingly made false certifications. Thus, the government cannot rely on its 2006 receipt of the McDermott report to defeat Defendant's claim that this case is barred by the statute of limitations.

**Conclusion**

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

(1) Defendant's Motion for Summary Judgment (DE 87, 88) is **GRANTED** on the grounds that this case is barred by the statute of limitations;

(2) A final judgment shall be entered separately.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 16th day of April, 2010.

KENNETH A. MARRA
United States District Court

Copies furnished to:
all counsel of record